|  |  |
|---|---|
| CRISTIAN AGUASVIVAS, <br>     Plaintiff, <br><br> v. <br><br> MIKE POMPEO, Secretary of State, <br> WILLIAM BARR, Attorney General, <br> JOHN GIBBONS, U.S. Marshal for the <br> District of Massachusetts, WING <br> CHAU, U.S. Marshal for the District of <br> Rhode Island, and DANIEL MARTIN, <br> Warden, Wyatt Detention Facility, <br>     Defendants. | C.A. No. 19-123-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge.

Petitioner Cristian Aguasvivas filed a Petition for Writ of Habeas Corpus

under 28 U.S.C. § 2241 and a complaint for declaratory and injunctive relief, claiming

that he faces the prospect of being extradited for a crime he did not commit to a

country where he will be tortured. The Court grants Mr. Aguasvivas' Petition for a

Writ of Habeas Corpus, dismisses the Extradition Complaint for failure to comply

with the relevant Treaty[1]; finds that Mr. Aguasvivas' extradition would violate the

United Nations Convention Against Torture and Other Cruel, Inhumane or

Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"), given

---

[1] Dominican Republic-American Treaty, DR-U.S., art. 7 § 3(c), Jan. 12, 2015,
T.I.A.S. No. 06-1215 ("Treaty").

the final Board of Immigration Appeals ruling; and orders Mr. Aguasvivas released from custody.

I.  FACTS

On December 6, 2013, Mr. Aguasvivas, a cabinet-maker apprentice and father of two, was waiting outside his boss' house to travel with him to a job, when agents of the Dominican Republic's National Directorate for Drug Control (DNCD) dressed in civilian clothing[2] and in an unmarked vehicle tried to arrest him for suspected drug dealing in the Dominican Republic.

Chaos erupted because Mr. Aguasvivas and his family and friends witnessing the event believed he was being kidnapped. The police cuffed Mr. Aguasvivas' hands in front of his body and forced him into the front passenger's seat of their unmarked vehicle. While two officers were physically pushing Mr. Aguasvivas into the vehicle, shots were fired. DNCD Agent Lorenzo Ubri Montero[3] died from his wounds, and Captain Felipe de Jesus Jimenez Garcia and Agent Jose Marino Hernandez Rodriguez[4] sustained non-fatal injuries in the commotion. Mr. Aguasvivas and his brother Francis Aguasvivas, who witnessed the event, fled from the scene.[5]

---

[2] According to Mr. Aguasvivas, police officers with the DNCD usually wear black vests marked with "DNCD." ECF No. 9-2 at 8.

[3] Agent Ubri was the brother of a high-ranking military general in the Dominican Republic. ECF No. 1 at 5.

[4] The Complaint seeking extradition listed this agent as Agent Hernandez, though all other documents refer to him as Henriquez. *In re Aguasvivas*, Misc. No. 17-MJ-4218-DHH (D. Mass. Sept. 13, 2017), ECF No. 2 at 2.

[5] The available information about the shooting comes from the testimony of witnesses in the immigration proceedings, a YouTube video capturing the incident (*available at* https://www.youtube.com/watch?v=sl8I71OFDyo) (last visited Sept. 16, 2019), and the documents submitted by the Dominican Republic in support of its

Documents written after the incident give conflicting evidence of the perpetrator of the killing. The autopsy of Agent Ubri conducted hours after the shooting states that "[Agent Ubri] was seriously injured when he and other agents of the [DNCD] were performing an anti-drug operation...[and] tried to arrest and introduce into a vehicle to a presumed drug dealer, but they were injured by someone else, who tried to stop the arrest." ECF No. 9-4 at 71. It also states that the decedent was killed by "distant" wounding. *Id.* But the arrest warrant issued by the Dominican police the day of the shooting, states "at the moment when the agents of the [DNCD] were making an anti-drug operation and were preparing to arrest Estarling Aguasvivas[6]...[he] disarmed and fired three shots to the [decedent]." *Id. at* 64. An affidavit by the Dominican prosecutor, written three years later, alleges that Mr. Aguasvivas "in a surprising way, attacked to the agent the [decedent], to whom disarmed and killed, opening fire on all the agents of the [DNCD] that were present." *Id.* at 58. In a supplemental affidavit dated four months later, the prosecutor asserts that the two "surviving victims of the shootout attack on the anti-narcotics patrol carried out by [Mr. Aguasvivas]" are "eyewitnesses because they saw [Mr. Aguasvivas] disarm, shoot, and kill the [decedent]." *Id.* at 84.

Following the shooting, to extract information from them about Mr. Aguasvivas' location, the DNCD tortured members of Mr. Aguasvivas' family,

---

extradition request, including an arrest warrant, two affidavits by a Dominican prosecutor, the autopsy of the decedent, and medical certificates of the injured officers.

[6] Mr. Aguasvivas' middle name is "Starling."

according to four family members.[7] *See* ECF No. 9-2 at 16-18 (summarizing the torture victims' testimony). The victims consistently testified about "having [] black bags placed over their heads and onions placed in their mouths," and that "the black bag/onion tactic, [was] intended to simulate/cause suffocation." ECF No. 9-5 at 2.

The Dominican police shot and killed Mr. Aguasvivas' brother, Francis Aguasvivas, soon after the brothers went their separate ways. Mr. Francis Aguasvivas' autopsy shows that he was killed "by contact of a firearm projectile" to the chest and lists his manner of death as homicide caused by wound to the heart. ECF No. 9-7 at 5, 6. The police maintain that they killed him in a shootout.

Mr. Aguasvivas fled the country and came to the United States upon hearing the news of his family's torture and his brother's death.

## II.   PROCEDURAL HISTORY

*Immigration Proceedings*

Upon arrival in the United States, Mr. Aguasvivas sought asylum, withholding of removal, and protection under the CAT in immigration court. The Immigration Judge held nine hearings and considered the testimony of ten witnesses. *See* ECF No. 9-2 at 14-15 (listing witnesses). Mr. Aguasvivas testified and called eight witnesses: Joseline Ballez, Angel Pimenthal, Keila Aguasvivas, and Sandra Aguasvivas testified to being tortured; Yolanda Diaz testified as a percipient witness; and three individuals testified as character witnesses. The Government called one

---

[7] They testified during Mr. Aguasvivas' immigration hearing proceedings. The Immigration Judge found all the victims credible, except for Sandra Aguasvivas. ECF No. 9-2 at 24.

witness, a DEA agent working in the Dominican Republic. *See id.* at 13-14 (summarizing the DEA agent's testimony). Mr. Aguasvivas also presented reports and articles documenting human rights violations by the Dominican police. *See id.* at 2-3, 5. The Government submitted documents in support of its allegation that Mr. Aguasvivas committed the shooting, including the Dominican arrest warrant, police reports, an Interpol notice for Mr. Aguasvivas, and news articles about Mr. Aguasvivas' involvement in the shooting. *See id.* at 4-5.

The Immigration Judge found that Mr. Aguasvivas was not eligible for asylum or withholding of removal because he did not establish persecution because of his race, religion, nationality, membership in a particular social group, or political opinion. *See id.* at 29. The Immigration Judge also found there were "serious reasons for believing" that Mr. Aguasvivas had committed the murder, a serious nonpolitical crime. *See id.* at 26, 29. The Immigration Judge also denied Mr. Aguasvivas the CAT relief. *See id.* at 30-31. Mr. Aguasvivas appealed.

The Board of Immigration Appeals ("BIA") reversed the decision on the CAT relief, concluding that Mr. Aguasvivas "met his burden of demonstrating on this record that it is more likely than not that he will be tortured at the instigation of or with the consent or acquiescence of public official[s] in the Dominican Republic." ECF No. 9-5 at 2. Significantly, the BIA held that

> The record contains evidence of human rights conditions in the Dominican Republic, including evidence revealing that despite efforts to curb abuses, there have been persistent reports of arbitrary arrests, extrajudicial killings, impunity, and corruption involving police and security forces, and that "the police were involved in incidents that resulted in maiming or severe injury to unarmed civilians." Indeed,

"[a]lthough the law prohibits torture, beatings, and physical abuse of detainee and prisoners, there were instances in which members of the security forces, primarily police, reportedly carried out such practices."

*Id.* (internal citations omitted). The BIA granted Mr. Aguasvivas withholding of removal. ECF No. 9-8. This represented the final order on the CAT. Mr. Aguasvivas was released from custody and the United States Government was barred from removing him from this country because of the likelihood that he would be tortured.

*Extradition Proceedings*

About one year after the BIA granted Mr. Aguasvivas withholding of removal under the CAT, the United States Government filed an Extradition Complaint in the United States District Court for the District of Massachusetts. *In re Aguasvivas*, Misc. No. 17-MJ-4218-DHH (D. Mass. Sept. 13, 2017). The request sought extradition on conspiracy, homicide, illegal possession of firearm, and robbery charges stemming from his arrest in the Dominican Republic. ECF No. 9-4 at 56. The United States Marshal Service detained Mr. Aguasvivas and he has been in federal custody at the Wyatt Detention Facility in Central Falls, Rhode Island for the last two years. Mr. Aguasvivas moved to dismiss the Extradition Complaint. The Magistrate Judge held a hearing on the motion to dismiss and an evidentiary hearing on the extradition request.

The Magistrate Judge found that the Treaty between the United States and the Dominican Republic was in full force and effect, and that the Treaty covered the crimes for which the Dominican Republic requested surrender. ECF No. 9-12 at 12-16. He also found that there was enough evidence to support a probable cause finding

on the charges of robbery, illegal possession of firearms, and murder, denying certification on the conspiracy charges. *Id.* at 17-31. He later issued an Order denying the motion to dismiss, issued a Certificate of Extraditability, and an Order of Commitment. *Id. at* 2, 38-39. The Magistrate Judge did not have the issue of the CAT before him. The matter now comes here by a Petition for Writ of Habeas Corpus, in essence appealing the Magistrate Judge's order.[8]

## III. DISCUSSION

Mr. Aguasvivas sets forth two arguments in seeking review of the Magistrate Judge's certificate of extradition. First, he challenges his extradition under the Treaty between the two countries by both claiming that there was no probable cause established that he committed the crimes, and that the Dominican Republic government did not meet the documentary requirements of the Treaty. Second, he argues that extradition is unlawful under the CAT because he will be tortured in the Dominican Republic if the United States returns him there. While the Court agrees with some of Mr. Aguasvivas' arguments and disagrees with others, ultimately it finds that Mr. Aguasvivas is not extraditable under either the Treaty or the CAT.

---

[8] The extradition proceedings were held in the District of Massachusetts, but Mr. Aguasvivas is being held in custody at the Wyatt Detention Facility in Rhode Island. The Government is not contesting that venue is proper in the District of Rhode Island. *Zhenli Ye Gon v. Holder*, 992 F. Supp. 2d 637, 643 (W.D. Va. 2014), *aff'd sub nom. Zhenli Ye Gon v. Holt*, 774 F.3d 207 (4th Cir. 2014) (venue is proper in the district of custody).

A.    TREATY DETERMINATION

    1.    Probable Cause Finding

        a.    Standard of Review

An extradition request must establish probable cause that the accused committed the offense or offenses for which extradition is sought. 18 U.S.C. § 3184; *see* Treaty. The First Circuit has held that on habeas corpus review of a Certificate of Extraditability, the court need only examine the Magistrate Judge's determination of probable cause to see if there is "any evidence" to support it. *United States v. Kin-Hong*, 110 F.3d 103, 116 (1st Cir. 1997) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). Previously, the Circuit interpreted the concept of "any evidence" liberally and historically conducted a deferential review of a magistrate judge's findings. *See Koskotas v. Roche*, 931 F.2d 169, 176 (1st Cir. 1991); *In re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989); *Brauch v. Raiche*, 618 F.2d 843, 854 (1st Cir. 1980); *Greci v. Birknes*, 527 F.2d 956, 958 (1st Cir. 1976).

But in *Kin-Hong*, the First Circuit acknowledged that other appellate courts have engaged in a more rigorous review of the evidence presented before a magistrate judge, that "it is arguable that the 'any evidence' standard is an anachronism, and that this court should engage in a more searching review of the magistrate's probable cause findings." *Kin-Hong*, 110 F.3d at 117. Despite this reflection, the court failed to adopt explicitly a more searching review because the government had met its burden in that case through whatever prism the court reviewed the record. *Id.* Thus,

the Court need only examine the Magistrate Judge's determination of probable cause to see if there is "any evidence" to support it.

b. Any Competent Evidence

In support of probable cause, the Government, on behalf of the Dominican Republic, offered: (1) the affidavit of Dominican Prosecutor Feliz Sanchez Arias, which attached the arrest warrant; the autopsy report for Agent Ubri; medical certificates for the two other drug agents who were shot; and two photographs of the person sought; (2) the supplemental affidavit of Prosecutor Sanchez; (3) the declaration and the supplement of State Department legal counsel Tom Heinemann; and (4) the second additional affidavit of Prosecutor Sanchez.

Contesting probable cause, Mr. Aguasvivas submitted: (1) a YouTube video of the shooting; (2) his concession that he is the person in the video wearing a blue shirt; (3) a Spanish transcription and English translation of statements heard on the video; (4) the affidavit of Prosecutor Sanchez in support of extraditing Mr. Aguasvivas' uncle, Ramon Emilio Aguasvivas; (5) transcriptions and translations of pertinent articles of the Dominican Criminal Procedure Code; (6) an affidavit of attorney Ambar M. Maceo, about the elements necessary to charge the crime of conspiracy under the Dominican Criminal Code; and (7) a decision from the Supreme Court of Justice of the Dominican Republic on the elements of conspiracy.

The Magistrate Judge's probable cause determination was based in part on Prosecutor Sanchez's affidavit recounting the incident and citing two eyewitnesses to

the shooting.[9]   ECF No. 9-12 at 20 ("In a nutshell, the prosecutor assigned to investigate this matter has sworn in an affidavit that two police officers who were present—and who were themselves wounded during the crime—saw Mr. Aguasvivas shoot Agent Ubri, and that Agent Ubri died of the gunshot wounds Mr. Aguasvivas inflicted.  While a more detailed affidavit certainly could have been presented, more is not necessary to establish probable cause.").  The Magistrate Judge also found that the autopsy report and the video evidence supported a probable cause finding.  *Id.* at 20-21.  He held that three bullets fired at short range to the area of the heart, as documented in the autopsy report, are enough to establish probable cause that Mr. Aguasvivas shot Agent Ubri with the intent to kill him.  *Id.* at 20.  He also held that the video supports a probable cause finding because it shows that the arrest occurred in good light with the agents within feet of Mr. Aguasvivas when the shots were fired, and thus they were well positioned to see the shooting and identify the shooter.  *Id.* at 21.

Through the generous and deferential prism of "any evidence warranting the finding that there was reasonable ground to believe the accused guilty," the Court finds that the Magistrate Judge's probable cause determination was supported by

---

[9] Mr. Aguasvivas argues that the statements of the two eyewitnesses are not "competent evidence" because the source of the statements is unknown.  But "competent evidence" is defined as "that which is properly admissible at the extradition hearing."  *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993).  The First Circuit has held that evidence supporting extraditability "may consist of hearsay, even entirely of hearsay." *Kin-Hong*, 110 F.3d at 120.

evidence (the affidavit, the video, the autopsy physical findings) and so this Court

must uphold that decision.[10] *Fernandez*, 268 U.S. at 312.

### 2. Treaty Compliance

Article 7 § 3 of the Treaty states that "a request for extradition of a person

sought for prosecution shall [] be supported by," *inter alia*:

(a) a copy of the warrant or order of arrest or detention issued by a judge
or other competent authority;

(b) a copy of the document setting forth the charges against the person
sought; and

(c) such information as would provide a reasonable basis to believe that
the person sought committed the offense or offenses for which
extradition is requested.

Mr. Aguasvivas argues that in addition to the warrant, the Treaty requires a formal

charging document lodged in the court system be presented. He stresses that the

warrant alone cannot satisfy the second requirement of section 3. The Court agrees

with Mr. Aguasvivas.

### a. Document Setting Forth the Charges

---

[10] A more searching review of the evidence, however, raises questions about the source and sufficiency of the eyewitness statements in the prosecutor's affidavit and the finding of probable cause. First, about the eyewitness statements in the prosecutor's affidavit, there is nothing in the record sourcing the statements from the officers identifying Mr. Aguasvivas as the shooter—the identification is assumed from a single sentence in the final paragraph of the prosecutor's supplemental affidavit. ECF No. 9-4 at 83-84. Additionally, the context in which the paragraph appears suggests that the police included that sentence to bolster the reasons why the officers were qualified to identify a photograph of Mr. Aguasvivas, rather than to serve as a statement by eyewitnesses. *Id.* Second, the medical examiner, who wrote the autopsy report only hours after the shooting, concluded that someone else, not Mr. Aguasvivas, committed the shooting. *Id.* at 71. Third, by the Government's own account, Mr. Aguasvivas was handcuffed throughout the event and during the time the shots were fired. *Id.* at 58. This Court's review of the video supports a finding that Mr. Aguasvivas was not the shooter. But this Court does not believe it has the legal mandate to do a more rigorous review.

The Treaty's requirement that the Dominican Republic government must include "the document setting forth the charges against the person," refers to a formal charging document. The Government has not set forth any evidence to show that the Dominican Republic government has formally charged Mr. Aguasvivas because there was no charging document. But the Government argues that formal charges are not required, and as the Magistrate Judge agreed, the arrest warrant itself satisfies the Treaty's requirement under both sections (a) and (b) cited above.

This Court rejects the Government's interpretation of Article 7 § 3.[11] The plain language of the Treaty supports the requirement that the requesting country must produce a formal charging document in addition to the warrant to support extradition.[12] The use of the qualifier "the" instead of "a" in front of "document setting forth the charges" in § 3(b) signifies that there must be a specific charging document presented. Additionally, the canon against surplusage supports this interpretation of § 3(b). If section (b) is to have any meaning, it must impose a requirement beyond what is required by subsection (a). In other words, if a warrant, required by § 3(a), satisfied both the warrant requirement and the charging document requirement, § 3(b) would be stripped of any meaning.

While the Magistrate Judge agreed with the Government's contention that the single Dominican arrest warrant could satisfy both requirements, the Court finds the

---

[11] Because this is a question of law, this Court reviews this issue de novo. *Bath Iron Works Corp. v. U.S. Dept. of Labor*, 336 F.3d 51, 55 (1st Cir. 2003).
[12] The Court also notes the use of the conjunction "and" in between sections (b) and (c).

basis for Magistrate Judge's reasoning flawed. In finding Mr. Aguasvivas extraditable, the Magistrate Judge relied on cases involving extradition treaties with other countries that did not contain the added requirement of a charging document. *See In re Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980) (U.S.-Switzerland treaty required "a duly certified or authenticated copy of the warrant of arrest or other order of detention"); *Emami v. U.S. Dist. Ct. for N. Dist. of Cal.*, 834 F.2d 1444, 1448 n. 3 (9th Cir. 1987) (U.S.-Germany treaty required "[a] warrant of arrest issued by a judge of a Requesting State and such evidence as…would justify his arrest and committal for trial"); *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1186 n.2 (U.S.-Mexico treaty required a "certified copy of the warrant of arrest issued by a judge or other judicial officer"). Indeed, the courts in *Assarsson* and *Emami* noted that the inclusion of the charging document in the list of required documents would have resulted in a different outcome. *See Assarsson*, 635 F.3d at 1243 ("If the parties had wished to include the additional requirement that a formal document called a charge be produced, they could have so provided."); *Emami*, 834 F.2d at 1448.

Here, the Treaty clearly requires that the requesting country produce and include a copy of the warrant *and* "the document setting forth the charges against the person." Because the Government's request for extradition was not supported by both a warrant and charging document, the Court finds that the Treaty does not allow for the extradition of Mr. Aguasvivas. But even if the Government fulfilled all the requirements of the Treaty, the extradition of Mr. Aguasvivas would still be prohibited.

## B.    EXTRADITION AND TORTURE DETERMINATION

Mr. Aguasvivas' second point in support of his argument that he is not extraditable is that the United States Government cannot lawfully extradite him because it is more likely than not that the Dominican Republic government will torture him if he returns to the Dominican Republic.   The BIA has already found that Mr. Aguasvivas is more likely than not to be tortured, so Mr. Aguasvivas argues that extradition is barred by the CAT, the Foreign Affairs Reform and Restructuring Act ("FARRA"), and the implementing regulations.  The relevant guiding laws state:

- *Convention Against Torture* :   Article 3 of the CAT states that "[n]o State Party shall expel, return ("refouler") or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture."  CAT Art. 3, § 1.

- *Foreign Affairs Reform and Restructuring Act*: Congress implemented the United States' obligations under the CAT through the FARRA in 1998.  It states that:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture....

FARRA, Pub. L. No. 105-227, Div. G, § 2242(a), 112 Stat. 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

- *Department of State Regulations:* The Department of State's ("DOS") implementing regulations state: "Article 3 of the Convention imposes on the parties

certain obligations with respect to extradition" and quotes the non-refoulement language of Article 3. *See* 22 C.F.R. § 95.2(a).[13] The "substantial grounds" language has been interpreted to mean that torture is "more likely than not." 22 C.F.R. § 95.1(c). The regulations also contemplate an internal procedure for determining compliance:

> In order to implement the obligation assumed by the United States pursuant to Article 3 of the Convention, the Department considers the question of whether a person facing extradition from the U.S. "is more likely than not" to be tortured in the State requesting extradition when appropriate in making this determination.

22 C.F.R. § 95.2(b).

• *Department of Justice Regulations*: Under the Department of Justice's ("DOJ") implementing regulations on the CAT,[14] an individual cannot be returned to a country if "it is more likely than not that he or she would be tortured." 8 C.F.R. § 1208.16(c)(2)-(4). There are two types of protection under the CAT: withholding of removal and deferral of removal. *See* 8 C.F.R. § 1208.16(c); 8 C.F.R. § 1208.17.

CAT prohibits a signatory country from returning an individual to a country where they would be tortured. Given CAT and its implementing statute and regulations, it is without question that it is United States' policy that it will not extradite a person after a determination is made that he or she is more likely than not to be tortured in that other country. The Government levels arguments against

---

[13] The full text of the DOS' implementing regulations appear at 22 C.F.R. §§ 95.1-95.4.

[14] *See* Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999).

the applicability of these legal authorities and precedent. Mr. Aguasvivas argues that res judicata precludes the DOS from revisiting the Executive Branch determination on torture. The Court will deal with each of these arguments in turn.

### 1. Ripeness

In arguing against application of the CAT, the Government first presses that the claims are not ripe for review because the Secretary of State has not yet decided whether to extradite Mr. Aguasvivas. The Government cites several cases where courts have held that the CAT torture claims are not ripe where the Secretary of State has not yet decided whether to surrender the petitioner. *See Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1357 (11th Cir. 2012); *Hoxha v. Levi*, 465 F.3d 554, 565 (3d Cir. 2006); *Masopust v. Fitzgerald*, No. 2:09-cv-1495-ARH, 2010 WL 324378, at *4 (W.D. Pa. Jan. 21, 2010); *Perez v. Mims*, Case No. 1:16-cv-00447-DAD-SKO, 2016 WL 3254036, at *2-3 (E.D. Cal. June 14, 2016).

But these cases did not involve a finding on the torture issue. Here, the BIA has already found that the Dominican Republic government is likely to torture Mr. Aguasvivas if the United States returns him. Indeed, the cited authority recognized that a prior finding on the likelihood of torture affects ripeness. *See Hoxha*, 465 F.3d at 565 (noting that petitioner's argument that he would be tortured was not ripe under the Administrative Procedures Act *because there was no prior finding on the torture issue*); *see also Meza*, 693 F.3d at 1357 (finding that the CAT claim is unripe before the Secretary's consideration *in the first instance* of humanitarian issues before Secretary's consideration). Because there has been a

final and conclusive finding of likelihood of torture, the issues in this habeas corpus case are ripe for this Court's review.

### 2. Jurisdiction

Next, the Court considers the Government's argument that it is barred from hearing the claims Mr. Aguasvivas raises under the statutes and regulations. The Government argues that the Court has no jurisdiction (1) because the doctrine of non-inquiry precludes consideration of torture claims; (2) under the CAT and FARRA; and/or (3) under the REAL ID Act. The Government also argues that limiting habeas corpus review here does not implicate the Suspension of Habeas Corpus Clause because the Secretary of State's surrender decision is outside the scope of habeas review. The Court rejects the Government's arguments and finds that there is jurisdiction to review the claims. The Court will begin with the Suspension Clause argument.

### a. Suspension of Habeas Corpus Clause

The United States Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001).

The Government argues that the Suspension Clause does not apply in this context because historically and practically, the role of a habeas court has not been

extended to issues about the treatment a fugitive would receive in a foreign state, but the caselaw says otherwise. The Supreme Court has held that "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *Id.* (citation omitted). The First Circuit has looked at whether a CAT claim fell within the historical ambit of habeas and found that it did. *See Saint Fort,* 329 F.3d at 201 ("American courts have exercised habeas review over claims of aliens based on treaty obligations since the earliest days of the republic."). It specifically recognized that review of extradition was historically among the functions of habeas, noting that "for centuries" "'federal courts employed the writ of habeas corpus to inquire into [,] [*inter alia,*] ..., extradition of aliens accused of crime....'" *Id.* at 197 (quoting G.L. Neuman, *Jurisdiction and the Rule of Law after the 1996 Immigration Act,* 113 Harv. L. Rev. 1963, 1966 (2000)). Thus, because the Suspension Clause of the Constitution has been interpreted to guarantee this Court's habeas jurisdiction, any attempt to remove such jurisdiction over Mr. Aguasvivas' CAT claim would violate the Suspension Clause. *See Saint Fort,* 329 F.3d at 200-02.[15]

---

[15] The Government argues that Mr. Aguasvivas' claims fall outside the Suspension Clause because the Secretary of State's decision to extradite involves an exercise of discretion, but the Court notes that Mr. Aguasvivas is arguing that his extradition is *prohibited* and so the Secretary has *no* discretion to extradite him. *Plaster v. United States,* 720 F.2d 340, 349 (4th Cir. 1983); *see also Mironescu v. Costner,* 480 F.3d 664, 670 (4th Cir. 2007) ("although the Executive has unlimited discretion to *refuse* to extradite a fugitive, it lacks the discretion to extradite a fugitive when extradition would" be unlawful).

### b. Doctrine of Non-Inquiry

The Government next argues the doctrine of non-inquiry deprives this Court of jurisdiction here. First, the rule of non-inquiry is not a jurisdictional rule. This doctrine counsels that extradition courts should refrain from evaluating petitioner claims that they will face mistreatment in a Requesting State in deference to the Executive Branch on such matters. While the First Circuit has held that non-inquiry encourages deference to the Executive Branch, it is not an absolute restraint on the courts. *See Kin-Hong*, 110 F.3d at 112 ("[n]one of these principles, including non-inquiry, may be regarded as an absolute."). A few courts that have applied non-inquiry have held that the rule implicates the *scope* of habeas review and does not affect federal habeas *jurisdiction*. *See Munaf v. Geren*, 553 U.S. 674, 700 (2008) (holding that the political branches should address the torture claims raised by habeas petitioners seeking to avoid transfer to a foreign country); *see also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("the rule [of non-inquiry] implicates only the *scope* of habeas review; it does not affect federal habeas *jurisdiction*.") (emphasis in original); *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980) (holding that the degree of risk to petitioner's life from extradition is an issue that falls within the purview of the Executive Branch). Thus, the rule of non-inquiry is applied when the petitioner questions the *wisdom* of the Secretary of State's decision to extradite, but it does not fit here, where Mr. Aguasvivas questions the *legality* of the extradition.

Additionally, and notably, the Executive Branch has already found that torture is probable. The Government argues that the doctrine of non-inquiry is important so as to not "undermine the Government's ability to speak with one voice in this area," *Munaf,* 553 U.S. at 702, but here, the Executive Branch has already spoken—the BIA found that it is more likely than not that the Dominican Republic government will torture Mr. Aguasvivas. Indeed, the Supreme Court in *Munaf* determined that habeas was not appropriate in a case in which the petitioners were in a foreign country, not seeking release from U.S. custody, and who had not raised a bona fide CAT/FARRA claim,[16] but distinguished that situation from "a more extreme case" where "the Executive *has determined that a detainee is likely to be tortured but decides to transfer him anyway." Id.* (emphasis added). This is precisely that extreme case.

### c. The CAT and FARRA

FARRA contains a jurisdiction-limiting provision:

> [N]o court shall have jurisdiction to review the regulations adopted to implement this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section, ... except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. [§] 1252).

FARRA § 2242(d). The Government argues that this language restricts a court's CAT review of a final order of removal in an immigration case, effectively repealing a court's habeas jurisdiction. But to repeal habeas jurisdiction, the Supreme Court has

---

[16] Mr. Aguasvivas is not in a foreign country, is seeking release from United States custody, and has raised a bona fide CAT/FARRA claim.

recognized a "strong presumption in favor of judicial review of administrative action and [a] long standing rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *St. Cyr*, 533 U.S. at 298. When statutory language signals an intent to strip jurisdiction, courts must consider whether "an alternative interpretation of the statute is 'fairly possible.'" *Id.* at 299-300 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The United States Supreme Court in *St. Cyr* found that language much like FARRA § 2242(d) had no clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas, and so did not remove habeas jurisdiction. *Id.* at 314.

Following *St. Cyr*, the First Circuit held that FARRA § 2242(d) does not remove habeas jurisdiction over the CAT claims. *Saint Fort v. Ashcroft*, 329 F.3d 191, 201 (1st Cir. 2003). In that case, Mr. Saint Fort sought to challenge the BIA's denial of the CAT relief and his only recourse was habeas as he was statutorily ineligible for a review of a final order of removal. *Id.* at 193. The Government argued that FARRA § 2242(d) precluded habeas jurisdiction, but the First Circuit disagreed, holding that § 2242(d) "is a consolidation of statutory jurisdiction, not a repeal of habeas jurisdiction." *Id.* at 201. The First Circuit concluded that "FARRA does not expressly refer to 28 U.S.C. § 2241 or to habeas review and we would not imply an intent to repeal habeas jurisdiction from silence." *Id.* at 201.

The Government argues that *Saint Fort* is distinguishable because it is an immigration case with no applicability to extradition. The Court rejects the distinction and finds no legal, statutory, or policy basis to read the language of

§2242(d) with one result for immigration habeas petitioners and another result for extradition habeas petitioners. Because FARRA contains no clear statement removing this Court's habeas jurisdiction, the Court finds that it does not do so.

### d. REAL ID Act

Congress passed the REAL ID Act in 2005. It provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

8 U.S.C. § 1252(a)(4). The Government argues that this provision removes habeas jurisdiction over Mr. Aguasvivas' CAT claims. The Court disagrees.

It is undisputed that Mr. Aguasvivas has no alternative to habeas to obtain judicial review of his claims so before finding that 8 U.S.C. § 1252(a)(4) removes habeas jurisdiction, the Court should look for "an alternative interpretation of the statute [that] is 'fairly possible.'" *Trinidad y Garcia*, 683 F.3d at 956 (quoting *St. Cyr*, 533 U.S. at 299-300). In *Trinidad y Garcia*, the Ninth Circuit explained that the REAL ID Act can be construed as confined to addressing final orders of removal, without affecting habeas jurisdiction as the surrounding provisions of § 1252 relate to immigration orders. *Id.* at 956.[17] "Given the plausible alternative statutory

---

[17] The purpose of the REAL ID Act's jurisdiction-stripping provisions was to "consolidate judicial review of immigration proceedings into one action in the court of appeals." *Id.* at 958 (Thomas, J., concurring) (quoting *St. Cyr*, 533 U.S. at 313).

construction," the court found that it could not "conclude that the REAL ID Act actually repealed the remedy of habeas corpus." *Id.* (citing *St. Cyr*, 533 U.S. at 299-300). Here, considering the Suspension Clause questions that would arise if the Court construed the provision to divest it of habeas jurisdiction, the Court must find that the statute does not affect its habeas jurisdiction "to avoid such problems." *See St. Cyr*, 533 U.S. at 300. The Court has habeas jurisdiction over Mr. Aguasvivas Petition.

### 3. Res Judicata

Mr. Aguasvivas asserts that the DOS is precluded or estopped under res judicata from revisiting the BIA's adjudication of the likelihood of torture. Res judicata is a principle that "a right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies." *S. Pac. R.R. v. United States*, 168 U.S. 1, 48-49 (1897). For an issue to be precluded from reexamination, the First Circuit requires that five elements must be met:

> 1. the determination must be over an issue which was actually litigated in the first forum; 2. that determination must result in a valid and final judgment; 3. the determination must be essential to the judgment which is rendered by, and in, the first forum; 4. the issue before the second forum must be same as the one in the first forum; and 5. the parties in the second action must be the same as those in the first.[18]

---

[18] The First Circuit has recognized that those in privity are also bound by res judicata. *NLRB*, 836 F.2d at 34-35 (finding privity where the interests of one party "cannot be disassociated from the interests" of the other).

*See NLRB v. Donna-Lee Sportswear Co., Inc.*, 836 F.2d 31, 34 (1st Cir. 1987). The Court finds that all factors here have been met, res judicata applies, and the BIA's torture determination cannot be disputed.

First, the issue was fully and fairly litigated. In immigration court, there were nine hearings, testimonial and documentary evidence that Mr. Aguasvivas' brother Francis was killed, extensive documentation of police practices in the Dominican Republic, and testimony by four victims of DNCD torture. *See* ECF No. 9-2. The record supports the conclusion that the Government had the capacity to litigate fully its position that the police acted in a legitimate law enforcement capacity. Mr. Aguasvivas appealed the Immigration Judge's denial of his asylum application and the Government opposed it. ECF No. 9-5. In litigating this case, the Government had all the available tools and utilized all opportunities to obtain diplomatic assurances from the Dominican Republic. Indeed, the Government contacted the Dominican Republic during the 2015-2016 litigation and submitted documents obtained from the Dominican Republic in the immigration proceedings. *See* ECF 9-2 at 4-7, 30-31. Both parties had a full and fair opportunity to litigate the issue.

Second, a valid and binding judgment found that Mr. Aguasvivas would likely be tortured in the Dominican Republic. The BIA determined that "[i]n view of the country conditions evidence in the record and the credible and detailed testimony of the respondent's witness,…the respondent has met his burden of demonstrating on this record that *it is more likely than not that he will be tortured at the instigation or with the consent or acquiescence of public officials in the Dominican Republic.*"

ECF No. 9-5 at 2 (emphasis added). The Government argues that the BIA finding is not binding on the Secretary of State in this extradition proceeding because immigration and extradition proceedings are separate and independent proceedings governed by different legal standards and procedures, relying on *Castaneda-Castillo v. Holder*, 638 F.3d 354, 361 (1st Cir. 2011). The Court rejects the Government's argument and its reliance on *Castaneda-Castillo* for two reasons: (1) the First Circuit in *Castaneda-Castillo* was determining whether the court should stay an asylum proceeding while an extradition proceeding moved forward and cited the Government's own language as dicta, *id.* at 360; and (2) the standard for an asylum proceeding bore no weight on the extradition proceeding[19] while here, the standard in the CAT proceeding is exactly the same as what the Secretary of State must use in the extradition determination. *See* CAT Art. 3, § 1, 22 C.F.R. § 95.1(c). The Court therefore finds no basis to decide that one arm of the Executive Branch can make a determination and another arm of the Executive Branch can ignore that determination when deciding the exact issue.

Third and fourth, whether torture is "more likely than not" was the central issue in the BIA's determination, *see* ECF No. 9-5, and the same one considered and

---

[19] In *Castaneda-Castillo*, the First Circuit rejected the government's argument that the court should hold an asylum appeal in abeyance as not to complicate extradition proceedings and noted that "the argument that adjudicating the asylum claim would somehow 'complicate' the extradition proceedings would have more legs if a decision on the former had legally preclusive effect on the latter." *Id.* at 360. The court also cited the government's own concession that "'the resolution of even a common issue in one proceeding is not binding in the other.'" *Id.*

decided in the immigration litigation as both agencies implement the same obligation under the CAT. *Compare* 8 C.F.R. § 1208.16(c)(4), *with* 22 C.F.R. § 95.2(b).

Lastly, Mr. Aguasvivas and the United States appear as the parties in both cases, so the parties are the same as or in privity with the parties in the immigration proceeding.[20]

With all factors satisfied, the Court holds that res judicata bars reexamination of the BIA's binding resolution that Mr. Aguasvivas is likely to be tortured upon extradition to the Dominican Republic.[21]

## IV. CONCLUSION

The mandate of the Treaty requiring that the Government produce the document setting forth the charges has not been met, and therefore Mr. Aguasvivas cannot be extradited under the Treaty. Moreover, the BIA's finding that Mr. Aguasvivas is likely to be tortured by the Dominican Republic government if he is returned to that country prohibits his extradition under CAT and its authorizing statutes and regulations.

For the reasons detailed above, it is hereby ORDERED as follows[22]:

---

[20] It may appear that the Dominican Republic is the party in this action and was not represented in the immigration proceeding. The United States Attorney's Manual states that the prosecutor who appears in court "in support of the request for extradition [] is representing the United States in fulfilling its obligations under the extradition treaty." USAM 9-15.700, 1997 WL 1944616 (June 1, 2018).

[21] Because the Court has found that extradition violates the CAT, FARRA, and implementing regulations and that the BIA finding is binding in the extradition proceeding, it need not examine the Due Process and Administrative Procedures Act arguments.

[22] The Court DENIES AS MOOT Mr. Aguasvivas' Motion for Bail. ECF No. 16.

(1) The Extradition Complaint against Cristian Starling Aguasvivas is DENIED AND DISMISSED WITH PREJUDICE under both the (a) Dominican Republic-American Treaty, DR-U.S., art. 7 § 3(c), Jan. 12, 2015, T.I.A.S. No. 06-1215 and (b) United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85;

(2) The United States Department of State is enjoined from surrendering Cristian Starling Aguasvivas to the Dominican Republic or any official of the Dominican Republic; and

(3) The United States Marshals Service is ordered immediately to release Cristian Starling Aguasvivas from custody.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge

September 18, 2019